v. Castle Rock Partners, LLC, Appellant. Mr. Smerensky for the Appellant. Mr. McCormack for the Appellant. Good morning. Judge Henderson will be considering this case based on the audio recording of the oral argument. You may proceed. Thank you, Your Honors, and may it please the Court. Ken Smerensky for the Appellant. There are multiple grounds for reversal set forth in our briefs, but I want to focus on two in particular, the principal grounds, which are independent grounds and which turn on the construction of unambiguous writings and therefore make this an appeal that's subject to de novo review. The first is, as this Court previously determined, the provision for termination. Section 16.2 of the ground lease provides for a two-step notice requirement. Thus, even if the ground rent payment, one of the ground rent payments, was due on May 30, 2013, a point I'll get not met. This is now law of the circuit based on the prior decision, and that alone, standing alone, is a basis for reversal. That all has to do with the $100,000 payment. Your Honor, the prior appeal interpreted the agreement to explain how notice was necessary for termination. There's no difference between the $100,000 and the $1.475 million. Well, the facts are the steps notice is given. Well, Your Honor, I'll address that in a moment. The way the provision works, though, is what was interpreted in the first appeal. And the way the provision works is very clear. First, there has to be a default, and then a notice is given. And upon the passage of time, that becomes an event of default. And then notice has to be given of the event of default. And after that time passes, then, and only then, can you appeal. Now, with regard to the actual notices that were given here, a couple points. First, the two notices from 2012 were withdrawn by the term sheet. But you... The district court said withdrawn dependent upon satisfaction of the terms of the term sheet. It didn't happen. Well, Your Honor, that was an error. It was a misinterpretation of a plain writing. The district court... It was a bit of reasoning about the court and satisfaction. Yes, Your Honor. There was a suggestion that the term sheet acted as an accord that hadn't been satisfied. That was error. You determine whether a document is an accord or a substituted contract based on its plain language. That's what the Schneider case says, for example, from the D.C. Circuit. And here, the term sheet acted with immediate effect. It's different from an accord. An accord says, in essence, if you do a certain act, then only... And only then will the claim be released. Here, the term sheet acted with immediate effect. The defaults were withdrawn. There was... The timetable, the new timetable is as follows. These are words of immediate effect. And so, those notices were, in fact, withdrawn. But even, Your Honor, if you didn't treat those as withdrawn, the breach here is alleged to be the failure to make a rent payment on May 30, 2013. A notice given in 2012, a year earlier, cannot be the first notice. The event of little d default has to have occurred for there to be a new timetable. 16.2 wouldn't be met. Go back just one clause or two. You said notice was for May 30. May 30? May 30, yes, Your Honor. And the first notice could not have been a year earlier or something you said? Yes. There were notices given in February and in March of 2012 with regard to the alleged obligation to pay rent on those days. And so there is no possibility that a May 2013 payment could have been effectively noticed by those events that occurred a year in advance. So, on that basis, those default notices aren't effective. The construction this Court put on, Section 16.2, remains binding, and therefore termination is improper. That alone is a basis for reversal. Let me talk some more about the effect of the term sheet. Again, it's a writing. It's signed. On this appeal, the University conceives that it's binding. Under East Bank, it is clear enough to be enforced. And what it did was it modified certain portions of the lease. Recall this is all occurring in the context of there's an existing 2010 set of agreements, and the term sheet modifies them. It modifies some of them with immediate effect. Those are closed terms, to use the language of the Seventh Circuit in the Venture case. And as to others, to be sure, there was still further negotiation to be done. Those were open terms, and the parties then negotiated over those. But as to the withdrawal of the defaults, as to the date for payment of the second rent payment in this 99-year lease, that date was changed with immediate effect. The new timetable is as follows. And as this Court noted in the first appeal, the provision states that that is not due until 90 days after the entry of the Second Amendment. And I recognize we also have the issue of the $100,000. And what happened there is clear. The record is clear. The developer informed the University it was not making that payment, and the parties continued on. The parties continued to negotiate. In the drafts of the Second Amendment, that amount was rolled in payment. And so to the extent there was a notice with regard to the $100,000. So what happens to the $100,000 now, then? The $100,000 is part of the $1.475 million. So we don't separately consider that? I don't believe so, Your Honor. If the University wanted to send a notice in the future for the payment of the $100,000, they of course could. They never have. And as a practical matter, everyone recognized in the negotiation They could, and what would happen? What would your response be? Today, if they were to send a notice on the $100,000, I'd have to think about that, Your Honor. They've never actually done it. If they did, one could look at it, one could decide whether, in fact, the payment should be made, or whether the party's actions over the subsequent year in terms of determining that all that amount would be owed only on a single date, whether that would govern. But regardless, we don't have to face that, because no notice was ever given as to that. Let me talk for a moment. Counsel, one second. I don't want to take your time with this now, but on rebuttal, would you just point out where in your brief you made the point that the notice regarding the May 30th, pardon me, that the earlier notice could not have served as the first of two notices with regard to the May 30th payment because of predate? I'd be happy to, Your Honor. And as you noted, I'd like to save the rest of my time for rebuttal. Okay, thank you. Unless you have other questions at this point. Thank you. Good morning, Your Honor. Timothy McCormick for Howard University. I think first we have to step back and look and see what did this Court do nearly three years ago in that first opinion. The Court's holding, we were before the Court on a very limited record, there had been no discovery, there had been no evidentiary hearings, there had been a motion for summary judgment. The Court's holding was there is a genuine dispute whether the developer was required to pay the University $1,475,000 by May 30th, and therefore whether the University was entitled to terminate the ground lease and collect $1,475,000 in damages. The Court then remanded to the District Court with the following direction. We leave it to the District Court on remand to determine in the first instance whether the term sheet is a legally enforceable contract under D.C. law, and if so, how the term sheet affects both the developer's claim that the University improperly terminated the ground lease and the University's counterclaim that it is entitled to collect $1,475,000. The term sheet was in the record before this Court three years ago. It was the same signed document, and this Court concluded that it was ambiguous and it couldn't determine on the face of the document. We're making the same argument today that they made three years ago, but in the interim, the District Court Judge Howell did exactly what this Court directed her to do. She conducted an eight-day bench trial. She heard the testimony of 11 witnesses. She received 272 exhibits. She made determinations as to credibility, the most significant of which is that she found not credible the two representatives of the developer, and found that the she made 78 pages of factual findings. Putting aside the prior history of the case, though, if you just look at the term sheet on its face, what about the fact that the payment is due only after execution of the ground lease and development agreement amendments, and those amendments were never executed? And it's just on its face. Putting aside the history in which you have an argument about, I understand, and what the District Court did. Well, we have to look at that, Your Honor, in the context of the factual findings that Judge Howell made, which is that the parties intended that there would be a reset once all of the provisions in the, what she called a Type II preliminary agreement were What is a Type II? Essentially, it's an executory accord, Your Honor. It's an agreement to agree. Where does typology come from? I'm sorry? Where does the typology come from? It's from the case law. There's a Type I. A Type I agreement would be a substitute contract. A Type II agreement is binding on the parties, but binds them to negotiate in good faith. And what Judge Howell found was that it was the intention of the parties that they would negotiate further in good faith, and she found that the developers' good faith was lacking, not the least of which is the nonpayment of the $100,000. But you say this was an agreement to agree. On its face, it does not look like that, the term sheet. I would respectfully, Your Honor, I would disagree. It says that we're withdrawing the notices, but it says the defaults are going to be addressed below. The argument of the developer is that they could sign this agreement. Now, first of all, we have to hold on to Judge Howell's findings. Right, I understand. Which we can only set aside if we find that they're clearly erroneous, and no one's directed us to any evidence that would indicate that she was clearly erroneous. Secondly, the developer's argument, in effect, is that they could have the university sign this agreement, and then simply refuse to sign Second Amendment documents that complied with it. And again, we have Judge Howell's finding, which is that within the time period provided in the agreement by the third week in April of 2012, the drafts that were consistent with the agreement, and that the developer delayed responding until May, and then rejected clear provisions that have been clearly provided for, even in the term sheet. And that couldn't have been foreseen when the term sheet was drafted? By whom, Your Honor? By Judge Howell. First of all, it was drafted by the other side. When you went and signed, I should say, then? I don't think...all of the witnesses expressed shock that the parties had not signed the agreement they thought. The university thought that they'd finally settled their multitude of defaults on the part of the developer. It just seems like if that was the intent, this was not drafted. I will agree with you on that, Your Honor. As precisely as it could have been. I will agree with you in that, Your Honor. We had a lawyer on the developer's side, and we had an accountant on the university's side. It is not a model of clarity, which is why this court couldn't decide the case three years ago on the papers, which is why Judge Howell couldn't decide the case at summary judgment on the papers, and why we had to have an eight-day trial to determine what did the parties intend. What do you do with the sixth provision that says, in the event that the developer fails to break ground by September 15, 2013, the ground lease will terminate, and both parties agree that all actions by either party prior to the execution of the ground lease amendment shall not be grounds for litigation? I realize that Judge Howell has looked at that on a number of occasions and said that if nothing else, that walk-away should be the end of the case. But I think the reality is when we look at the factual findings and the evidence before the district court, what truly happened here is that by May of 2012, less than a month after this term sheet was signed, the parties abandoned it, and from that point on, all of the negotiations were on very different terms than this term sheet. In fact, there were no exchange of drafts throughout the summer of 2012. The parties resumed exchanging drafts again in December of 2012, and they were completely different drafts. The testimony below was that the developer had at all times, as it drafted this forced settlement term sheet and presented it, that it had an undisclosed intention to perform only because it thought it was close to getting a commitment for financing. And when it did not get that commitment, the evidence below was it then no longer wanted to go forward on these terms and began proposing new terms which should be expressly conditioned on the developer obtaining financing. And the record below is clear. The university consistently said no to that. It did continue to negotiate on other terms beginning in December and throughout 2013. The walk-away provision is there, but it was clearly that was intended, and it appears in the first two drafts of the documents that were provided by the university developer first in April of 2013 and then in May. The developer refused to sign those drafts or to negotiate on those terms, and when the parties resumed their negotiation at the end of the year, it was on other terms. Why can't you read that to suggest that if none of these things happen or if not all of these things happen, either side can walk away? You very well could read it. It could be read that way. I'd like to address for just a moment the notice, because I see I'm running short of time. There's two issues there. First, we have Judge Howell's factual finding that the intention was that only upon performance, but there's a more important point, which is that the developer comes to this court in a very formulaic sense saying a notice of default must be in some form, although the agreements don't require that. And what's clear that even if we set aside the September 2011, February, March, and December 2012 notices to the developer that they were in default of their rent payments, on February 1, 2013, then General Counsel of the University, Kurt Schmoke, sent an email to the developer and said, unless the rent is paid by May 30 of 2013, the university would go no further, that they were in default. The university repeated that notice on April 9 and April 16. So there's a first notice by email, which is a four-month notice. Now, the developer makes – And that was – you said February 1, and what is the next one? The next one is April 9, 2013. In the form of that? In the form of that is, again, an email. On April 16, 2013, is a letter. More importantly, there is acknowledgment of these notices going to the developer from the developer on February 1, 2013, March 12, 2013, April 1, 2013, April 15, 2013, and May 23, 2013. So the developer was aware and keeps referring to the payment that had been demanded or that would be due on May 30. The developer makes much of the fact of whether there's a question as to whether they agreed, but at that point, at that juncture in the relationship, the university didn't need their agreement. The payment was two years overdue. So the university was within its rights, because the parties had never amended the documents, because of the developer's bad faith, to say you must now make the payment by a date certain. It gave them four months lead time. And so the notice on June 3rd – The payment demanded as of May 30 was not for rent up to the date of May 30, correct? Correct, correct. At all times, the $1,475,000 represents back rent up through the March 15, 2011 date, which is why the court's determination as to remedies was appropriate, because that $1,475,000 was for the actual use in occupancy. The termination of the lease was appropriate, because to this date there's been no cure, no tender of cure, and the university was entitled to have the rights of the developer and the property terminated. I see beyond my time, unless the court has any additional questions. Thank you very much. Thank you very much. Let me first address the question you had asked me earlier, Judge Ginsburg. The one to which your friend just responded? I'm sorry? This question about the notice. Yes. The dates. Go ahead. Yes, so it's page 41 of our opening brief is where we make the argument that those notices, even if they hadn't been withdrawn, could not serve as notice of the May 30, 2013. You just heard your friend say that this all related to rents that were due at a much earlier date, not rents that were due for the first time on May 30 or up through May 30. So your point about the earlier notices, February and April 2013, he says, well, those were your prior notices with regard to the termination, the default and then termination. Well, Your Honor, let me say two things. First, it's not clear what time period those related to. There were, over the course of this 99-year lease, going to be a stream of rent payments, and the way it was set up was there was an initial payment of $525,000 and then an ex-payment of $1.475 million. And then there were going to be, in the future, further payments. So whether this payment – If the $2 million had been paid, the $1.4, that would be rent up through what date? It would be up through a – it's a date that turned on when the construction began. So this is a ground lease, so basically once the building is up and generating income, that impacts when you would have the further obligation. So that date isn't set. So it was not actually due in 2011? No, Your Honor, it was not. And again, critically, under the term sheet, the parties modified all this. And I want to address something. The record here is very clear with regard to the term sheet. Mr. McCormick, counsel to the other side, reviewed the term sheet. He says there was an accountant on the other side. There was a stipulation before the trial court that that had gone to universities' counsel. So this is not – while it's not the clearest possible document that was ever written, what is clear about it? It's clear that the default notices are hereby withdrawn immediately, and it's also clear that there is a – the new timetable is as follows. So if there had been rent due earlier, and under the original agreements there would have been, that was modified with immediate effect. Let me say a word as well, Your Honors, about forfeiture, another issue here. This was a 1990 – – law is very clear with respect to forfeiture of leases, that it's a harsh and disfavored remedy. And when it comes to rent, there's an alternative remedy, which is the payment of rent. And, in fact, here not only was that alternative remedy available, it was, in fact, ordered. And so there is a judgment for the rent that hasn't been paid. So under Trans-Lux and Shapiro and those D.C. Court of Appeals cases, it was error here to hold forfeiture of the lease. I take those cases to say it would have been error, at least one type of error, if the rent payments covered any period overlapping the forfeiture. But, in fact, they're all retrospective, whereas the forfeiture is prospective. Well, Your Honor, I don't think those cases say that, number one. Number two, those cases make clear that once that rent payment is made, forfeiture is no longer available as a remedy. And so that's what those cases stand for. And here we have that. So you think there's no discretion here in the district judge? I think to the extent the district judge had discretion, she abused it in these circumstances. Recall the only breach alleged, the only breach that is the basis for the forfeiture, is the failure to make a single rent payment. Her decision has remedied that to the extent you believe a rent payment was due, because she ordered it paid with interest. And that, those cases say, is the alternative remedy that's available and what makes this a harsh and disfavored remedy and, therefore, not available. As with some of your other arguments, the problem is the finding, unless it's upset, of bad faith. Your Honor, we were Which would make it seem perfectly reasonable to impose a forfeiture rather than shackling two people, two parties, where there's been bad faith, into a continuing relationship. Well, Your Honor, first, we believe the bad faith finding was error, and we've explained that. But let me just assume for the moment that you don't reverse on those graphs. You're still left with the only obligation that wasn't met, that is the obligation that is the basis for the forfeiture, is the failure to make a single rent payment. That's all you have. The other stuff is not part of the basis for the finding of breach of that payment and, therefore, forfeiture is inappropriate under the D.C. cases. Let me say another thing, though, about the notices, because there were some questions about that and counsel tried to suggest here for the first time that, for example, the February 1, 2013 email was a notice under the lease. The lease is very specific. Section 22 of the lease sets forth the requirements for a notice. It must be in writing. It must be in bold type. It must be sent to developer's counsel, et cetera. An off-the-cuff email is not a formal notice under the ground lease. And I'd note further, it's interesting how this email is morphed, because the last time we were here before this court, the university argued that there had been an agreement in a phone call on February 1 that payment would be made by May 30th. What we saw at trial was that didn't happen. Mr. Schmoke said that he had no recollection of such an agreement being made, and, in fact, in his deposition he said, no, no, no, no, no. That conversation was not about rent. Couldn't have been more emphatic. So it's morphed. There was not an agreement, and it's not a notice. The only things they argue were notices are the two ones that we've talked about already at length in 2012, an earlier notice from 2011 in which the notice doesn't state that any rent is due because it's not yet due, and then there's a letter from December of 2012 that they referenced that, again, is not a notice. Notices of default are formal documents. They were purportedly given in February and March of 2012, but they were withdrawn. That's the effect of the term sheet. The parties changed the manner in which they were going to deal. They modified their agreement. They did so with immediate effect. That's not an accord. That's a substituted contract. Certainly the university could have sued on the term sheet had they decided to do so. What was the consideration given if that was a new contract? Well, among other things, the developer agreed that $525,000, which was being held in escrow to handle the university's environmental cleanup obligations, would be immediately made available to the university, and that was done. Was it? It was. Yes, that was done. That was immediately performed in May of 2012, and then there were obviously other considerations. The developer continued to put money into the project. The developer continued to do designs. There's a reference in your brief. I'm glad you remind me of that. There's a statement, a flat-out declarative statement at the page for you to the effect that the developer has expended millions of dollars in this deal, but there's no citation that's on page 49. This action was filed less than four years into a 99-year lease after the developer invested millions of dollars in something. No page reference. I apologize for that. In the references, there was testimony at trial, and there was something that was called a grid note that kept track of all of the monies that were spent on the project, and that exists in the record, and we can provide the citation to you, Your Honor. I apologize for that not being in the brief. It's an exhibit, right? Yes, Your Honor. We'll find it without any difficulty. Okay. Unless you have other questions. Okay. Thank you very much. Thank you. The case is submitted.
judges: Henderson, Kavanaugh, Ginsburg